WILLIAMS *v.* MAIER.

4-8473

210 S. W. 2d 499

Opinion delivered April 19, 1948.

Rehearing denied May 17, 1948.

*M. F. Elms,* for appellant.

*A. G. Meehan* and *G. B. Segraves, Jr.,* for appellee.

SMITH, J. Appellant owned and operated a lead mine near Point Cedar, Arkansas. Her mine shaft filled with water, and her pump in use was not adequate to draw it off. She went to Stuttgart to rent a pump, but was unable to do so. She was told by Mr. Ragland, the owner and operator of a machine shop in that city, that appellee had a second hand pump for sale. She contacted appellee, who offered to sell his pump for $400, but when he learned that appellant required another thirteen foot joint of pipe, he increased the price to $500. He proposed to deliver the pump for the additional sum of $25, making the purchase price $525. Appellee told appellant that the pump was six miles from town, and a mile from the highway, and could not be examined because of the muddy road, which would have to be traveled to get to it. However, appellee represented that the pump was in A-1 condition, and upon this representation she bought it. That this representation was made is conclusively evidenced by the bill of sale appellee gave appellant which reads as follows:

"November 14, 1945

"Mr. W. M. Maier promises to deliver to Mrs. Lena D. Price-Williams one 10″ Layne Pump, and 110′ of column complete, and it is guaranteed to be in A-1 workable condition, for the sum of $525, cash in hand paid, the receipt of which is hereby acknowledged. Said pump is to be delivered to the property of Price-Williams Lead

and Zinc Mines at Point Cedar, Arkansas, on or before November 16, 1945.

"W. M. Maier."

The pump was delivered and installed and after trial was found not to be in A-1 workable condition. This is shown not only by the overwhelming preponderance of the evidence, but we think without substantial contradiction. The only evidence that it was in A-1 workable condition when sold was the testimony of appellee that he had used the pump successfully for a period of six years, without trouble except the usual and incidental repairs required in its operation, which had been in use for an indefinite time before appellee bought it. But no testimony was offered that it operated successfully when placed in appellant's mine shaft, or could have been. The undisputed testimony to the effect that the pump would not work successfully and could not be made to do so, is to the following effect. The persons who installed the pump and attempted to operate it were shown to be experienced in the operation and installation of pumps gave testimony as to the bad condition of the pump. Appellant employed a mán whose business it was to install pumps, as she was not certain that her own employees could successfully install it. Typical of the testimony as to the condition of the pump was that of F. C. Liveoak, who was appellant's mine superintendent. He testified that he had worked twelve or fifteen years in the oil fields and had worked ten or twelve years mining. He testified that he examined this pump after its delivery, and that he advised appellant to make no attempt to install it, as it was just a pile of junk. It was caked with rust, its bearings were worn, the stuffing boxes were worn out, water would come in and drown out the oil, and they had to pour oil in all the time they were operating it. The pump was cleaned, several days being spent in doing so, in an approved manner, and after being properly placed in the mine shaft it was started Thursday evening, and was operated that night and Friday, and went out around 2:30 Sunday morning, and could not be further operated. It constantly gave trouble,

they had to stand over it constantly to keep it running cool, and kept pouring oil in it, and the water would come up and drive the oil out as fast as it was poured in. They had plenty of oil, and but for its constant use the pump would have gone out in thirty minutes, because if you cannot get oil through the pump properly, water will come in and heat it greatly. Operations were discontinued after a few hours' use and a part of the pipe was sent to a machine shop to be threaded, some bearings were made and other work was done, but the pump thereafter functioned no better. This witness testified that the pump was put in the mine over his protest, and that he started to quit when his protest was ignored, but that he was persuaded to remain, and that the day after the pump was installed he quit appellant's employment and has not been employed by her since. He and a number of other witnesses familiar with the construction of pumps, explained their operation, using terms difficult to understand by one without mechanical training. These numerous witnesses, all more or less experienced in the operation of pumps, testified that the bearings and bushings were worn out and no one testified that the pump could have been successfully operated.

One Childers, the assistant of Tuthill, who had been employed to install the pump, superintended its installation, and testified that the pump was not in good working condition as the bearings were worn out and so badly worn you could stick a twelve-inch file down between the pump bowl and the bearings and you could see where it was worn. No one testified that the pump was not properly installed. No one testified that it worked successfully or could have been made to do so by proper operation. An honest effort was made by competent pump people to operate the pump, without success, at considerable expense. Indeed it was shown that additional damage to the pump was done in the attempt to operate it. One Fox, employed by appellant as a mechanic in charge of her mine, testified that the damage would not have been done if the pump had been in reasonably good working order, and that the pump stopped,

or burned out from general wear in the tubing and bushing.

Ragland, who referred appellant to appellee, testified that after the pump had been drawn by appellant, he offered $350 for it, but his offer was refused. It was not shown what use Ragland could or would have made of the pump had he bought it, but it was his business to repair pumps.

Appellant testified that after the pump failed to operate it was pulled out of the shaft, and she had the pump examined by Mr. Whalen, reputed to be the best pump man in Hot Springs, who after he examined the pump refused to do any work on it for the reason that it was worn out and was beyond repair.

The pump was delivered at appellant's mine November 16, 1945, and several days were spent in cleaning it as it was full of mud. Appellant came to Stuttgart a few days after removing the pump from the mine and demanded the return of her money, which was refused. She filed her complaint demanding the return of her money December 27, 1945, in which she alleged her offer to return the pump and "that she makes no claim to same, but that it is on the ground subject to the orders of the defendant." The answer contained a general denial of the allegations of the complaint, but did not specifically deny that the return of the pump had been tendered as alleged.

There was testimony to the effect that appellant's employees continued to use the pump after knowing that it was heating and would burn out if its use was continued, but that it was thought it could be used long enough to lower the water level to that of the smaller pipe in the shaft. But nevertheless the testimony is undisputed that the pump was not in A-1 condition at any time as it was warranted to be. We find therefore that there was a breach of the warranty under which the pump was sold.

Section 69 of Act 428 of the Acts of 1941 declares the remedies available for the breach of a warranty in

a contract for the sale of goods. This Act is entitled: "An Act to Make Uniform the Law of Sales of Goods," and is commonly referred to as the Uniform Sales Law.

Section 69 of this Act provides the remedies the buyer has for a breach of warranty. Sub-section D of this section provided that "The buyer may, at his election . . . rescind the contract to sell or the sale and refuse to receive the goods, or if the goods have already been received, return them or offer to return them to the seller and recover the price or any part thereof which has been paid."

Sub-paragraph three of this section provides: "Where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods, or if he fails to notify the seller within a reasonable time of the election to rescind, or if he fails to return or to offer to return the goods to the seller in substantially as good condition as they were in at the time the property was transferred to the buyer. But if deterioration or injury of the goods is due to the breach of warranty, such deterioration or injury shall not prevent the buyer from returning or offering to return the goods to the seller and rescinding the sale."

Here it is insisted that if appellant's testimony is true, she knew of the breach of warranty before she attempted to use the pump, and that when the offer to return the pump was made it was not in "substantially as good condition" as it was when the pump was delivered.

The testimony shows that appellant's use of the pump was made in the attempt to operate it, but it shows in addition that after discovering its condition she continued to use it in the evident attempt to pump off the water before the pump burned up. Appellant's mechanic employed at her mine testified that he knew what was going to happen if they continued to operate the pump in its worn condition, and that with knowledge that the

pump was burning up they tried to finish the job of pumping off the water before it did burn up.

By paragraph 7 of § 69 of Act 428 it is provided: "In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty."

Of course appellant could not recover the value the pump would have had if she had not burned it up in the attempt to finish the job before it did burn up, and appellee must be credited with the amount or extent of the damage which she did to the pump in its improper use after knowing its defective condition. She would therefore be entitled to recover the price she paid for the pump less the diminished value due to its improper use. In addition she would be entitled to the cost of installation of the pump, and the cost of the repairs, and the parts which she bought.

The annotation to the Uniform Sales Act, page 338, cites cases which hold that such expenses are recoverable. Among others the case of *Moss* v. *Yount,* 296 Ky. 415, 177 S. W. 2d 372, 151 A. L. R. 441, in which case it was held that where a tractor sold was worthless except as junk, buyer's reasonable efforts to restore tractor to condition where it would serve purpose for which it was bought, and expenses while making such efforts were proximate result of seller's breach of warranty. Other cases cited to the same effect are *Stevens* v. *Howe Co.,* 275 Mass. 398, 176 N. E. 208, and *Plumbers Supply Co.,* v. *Lanter,* 280 Ky. 523, 133 S. W. 2d 739.

We conclude, therefore, that the judgment below must be reversed and the cause will be remanded with directions to submit for the jury's determination the amount of appellant's damage, against which appellee will be credited with the amount of the damage to the pump resulting from its use after it was known that it could not be operated successfully.